IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **CHARLES DAVID WILLIAMS, Jr.,** | ) | **1:08-CV-546  AWI DLB** |
| | ) | |
| **Plaintiff**, | ) | **ORDER ON DEFENDANT'S** |
| **v.** | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| **DOMINIC BARTEAU, and the** | ) | |
| **PORTERVILLE POLICE** | ) | (Doc. No. 41) |
| **DEPARTMENT,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

This case arises from the arrest of Plaintiff Charles Williams, Jr. ("Williams") by Defendant City of Porterville Police Officer Dominic Barteau ("Barteau") for burglary.  Williams filed suit in this Court and alleges claims under 42 U.S.C. § 1983 (for violations of the Fourth and Fourteenth Amendments).  In essence, Williams challenges the propriety of Barteau's entry into a garage to arrest Williams.  Defendants now moves for summary judgment on all claims.[1]  For the reasons that follow, the motion will be granted.

---

[1] On February 22, 2010, Williams filed a request for judicial notice.  The request for judicial notice is in actuality an unauthorized sur-reply.  The local rules do not authorize sur-replies.  See Local Rule 230; Coe v. Yates, 2010 U.S. Dist. LEXIS 5325, *2 (E.D. Cal. Jan. 23, 2010); Smith v. Pac. Bell Tel. Co., 649 F.Supp.2d 1073, 1083-84 (E.D. Cal. 2009).  Williams did not seek permission to file a sur-reply, nor did the Court request or authorize the filing of a sur-reply.  Because Williams filed an unauthorized sur-reply, the Court will strike and not consider the filing – Document 53.  See Coe, 2010 U.S.Dist. LEXIS 5325 at *2-*3; Smith, 649 F.Supp.2d at 1083-84; Empire Fire & Marine Ins. Co. v. Rosenbaum, 2007 U.S. Dist. LEXIS 27392, *3 n.2 (E.D. Cal. Mar. 28, 2007).

## FACTUAL BACKGROUND

On December 28, 2005, Barteau was dispatched to 1371 W. Jean Ave. to investigate a residential burglary.  See Barteau Dec. ¶ 2.  The victim, Ortega, told Barteau that his residence had been burglarized between 4:45 a.m. and 3:30 p.m. and that he had asked his neighbors if they had seen anything.  See id. at ¶ 3.  According to Ortega, one neighbor, Melissa Williams ("Melissa"),[2] "related through Derrald Bowman, that her father, Williams, told her that he had broken into Ortega's residence and stolen money, jewelry, and a $2 bill.  See id. at ¶ 4.  Ortega informed Barteau that he had checked his residence and that approximately $50.00 in U.S. coins, a new $2 bill, and his girlfriend's jewelry were missing.  See id. at ¶ 5.  Ortega also told Barteau that he had observed a shoe track on the toilet in the master bedroom and that the window screen had been removed and the window had been opened.  See id. at ¶ 6.

Barteau contacted Melissa, who told him that she had seen her father Williams with a large amount of coins, jewelry, and a $2 bill earlier in the day.  See id. at ¶ 7.  Melissa told Barteau that when she asked Williams where he had obtained those items, Williams told her that he had burglarized Ortega's home.  See id. at ¶ 8.  Melissa indicated that Williams was not present and had left the residence (presumably 1360 W. Jean Ave.).[3]

On January 18, 2006, Barteau was informed that Williams had returned to the residence located at 1360W. Jean Ave.  See id. at ¶ 9.  Barteau requested a records check to verify that there was an outstanding arrest warrant for Williams.  See id.  Barteau was informed that there were no outstanding arrest warrants for Williams.  See id. at ¶ 10.  However, Barteau recalled receiving a complaint authorization form from the District Attorney's officer on January 17, 2006, in which charges under Penal Code § 459 (burglary) had been approved.  See id.

---

[2]Melissa was born in 1981.  See Melissa Williams Dec. at ¶ 1.

[3]It appears that "the residence" referred to in Barteau's declaration is Melissa's residence, i.e.1360 W. Jean Ave.  See Melissa Williams Dec. ¶ 3; Barteau Dec. ¶ 9.  Also, there is a dispute as to why Williams was not present. Defendants contend that Williams ran from the residence because Melissa threatened to call the police.  See Barteau Dec. at ¶ 8.  Williams contends that he did not flee but had to run an unspecified errand, and a partial copy of a transcript shows that Melissa did not threaten to call the police.  See Williams Dec. ¶ 5, Exhibit B.  In reply, Defendants state *inter alia* that the reason why Williams left the residence is irrelevant.  The Court agrees.  The Court will only view the evidence as showing that Williams had left the residence and was not present when Barteau spoke with Melissa.  The Court will not consider that Williams left due to a threat by Melissa to call the police.

Barteau and another Porterville police officer went to 1360 West Jean Ave.  See id. at ¶ 11.  At that time, Charles Williams, Sr. ("Charles") and Melissa (among others) resided at this address.  See Melissa Williams Dec. ¶ 3;[4] Williams Dec. ¶ 3; see also Charles Williams, Sr. Dec. ¶¶ 1, 2.  Charles was the primary renter of 1360 W. Jean Ave. and was the head of the Williams Family.  See Charles Williams, Sr. Dec. ¶ 1.  Williams lived in the garage of 1360 W. Jean Ave.  See Williams Dec. ¶ 3; Charles Williams, Sr. Dec. ¶ 3.  Williams "was the sole occupant of the garage area."  Charles Williams, Sr. Dec. ¶ 3; Williams Dec. ¶ 3.

Barteau informed Melissa that he and the other officer were there to arrest her father for the suspected burglary of Ortega.  See Barteau Dec. at ¶ 11; see also Melissa Williams Dec. ¶ 4.  Melissa told Barteau that Williams was in the backyard.  See Melissa Williams Dec. ¶ 4.[5]  Barteau requested that he and the other officer be permitted to enter Melissa's residence to effectuate Williams's arrest.  See Barteau Dec. at ¶ 12; Melissa Williams Dec. at ¶ 4.  Melissa gave permission for the officers to enter her residence.  See id.  According to Charles's declaration, a police officer arrived at the house and asked to speak with Williams.  See Charles Williams, Sr. Dec. ¶ 5.[6]  Charles told the officer that he would get Williams.  See id.  Charles and the officer walked through the house to the kitchen.  See id.  At the kitchen/garage door, Charles

---

[4]Williams objects that Melissa's declaration was not disclosed as required by Federal Rule of Civil Procedure 26(a)(1).  However, Rule 26(a)(1)(B)(iv) provides that "an action brought without an attorney by a person in the custody of the United States, a state, or a state subdivision" is "exempt from the initial disclosure."  Fed. R. Civ. Pro. 26(a)(1)(B)(iv).  Here, Williams is pro se and at the time of filing (as well as now) was incarcerated at the Mule Creek State Prison in Ione, California.  See Court's Docket Doc. No. 1.  Therefore, the initial disclosure requirement that Williams relies upon does not apply to this "proceeding"/case; Williams's objection to Melissa's declaration is overruled.  See Fed. R. Civ. Pro. 26(a)(1)(B)(iv).

[5]Paragraph 4 of Melissa's declaration reads in full:
On January 18, 2006, two police officers from the City of Porterville Police Department came to my home inquiring about my father, [Williams].  They indicated they were there to arrest my father for burglary.  I told them he was in the backyard.  The officers asked if they could enter my home, and I gave them permission to do so.  The officers came in and arrested my father."

[6]Paragraph 5 of Charles's declaration reads in full:
On or about January 18, 2006, a Porterville Police Officer came to my home and asked to speak with my son, Charles David Williams, Jr.  I told the officer that I would get my son.  I walked through the house, with the officer following me into the kitchen.  I went to the kitchen/garage door of my son's residence and knocked on the door.  My son told me to come in.  I opened the door and told my son that there was a police officer here to talk with him.  At that point, the police officer walked by me into the garage without permission.  The officer held up a piece of paper, I could not tell if it was a warrant or not.

1   knocked.   See id.  Charles asked to come in.  See Williams Dec. at ¶ 4.  Williams told Charles

2   to "come in."  See id.; Charles Williams, Sr. Dec. ¶ 5.  Charles opened the door and said that a

3   police officer was there to talk to him.  See id.  The officer then walked by Charles and into the

4   garage "without permission."  See Charles Williams, Sr. Dec. ¶ 5.  The officers found Williams

5   in the residence's garage and placed him under arrest.  See Barteau Dec. ¶ 13; Williams Dec. ¶ 4.

6   After placing Williams under arrest, the officers took him through the house in handcuffs and

7   left.  See Charles Williams, Sr. Dec. ¶ 6.

8

9                    **SUMMARY JUDGMENT STANDARD**

10       Summary judgment is appropriate when it is demonstrated that there exists no genuine

11  issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

12  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v.

13  American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).  The party seeking summary

14  judgment bears the initial burden of informing the court of the basis for its motion and of

15  identifying the portions of the declarations (if any), pleadings, and  discovery that demonstrate an

16  absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);

17  Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  A fact is "material" if it

18  might affect the outcome of the suit under the governing law.  See Anderson v. Liberty Lobby,

19  Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings

20  Assn, 322 F.3d 1039, 1046 (9th Cir. 2002).  A dispute is "genuine" as to a material fact if there is

21  sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  Anderson,

22  477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

23       Where the moving party will have the burden of proof on an issue at trial, the movant

24  must affirmatively demonstrate that no reasonable trier of fact could find other than for the

25  movant.  Soremekun, 509 F.3d at 984.  Where the non-moving party will have the burden of

26  proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

27  element of the non-moving party's claim or by merely pointing out that there is an absence of

28  evidence to support an essential element of the non-moving party's claim.  See James River Ins.

4

1   Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire

2   & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000).  If a moving party fails

3   to carry its burden of production, then "the non-moving party has no obligation to produce

4   anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan

5   Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  If the

6   moving party meets its initial burden, the burden then shifts to the opposing party to establish

7   that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v.

8   Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103.  The

9   opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must

10  instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for

11  trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting

12  Fed. R. Civ. Pro. 56(e)).

13          The evidence of the opposing party is to be believed, and all reasonable inferences that

14  may be drawn from the facts placed before the court must be drawn in favor of the opposing

15  party.  See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad,

16  Inc., 350 F.3d 1061, 1065 (9th Cir. 2003).  Nevertheless, inferences are not drawn out of the air,

17  and it is the opposing party's obligation to produce a factual predicate from which the inference

18  may be drawn.  See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008);

19  UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004).  "A genuine issue of

20  material fact does not spring into being simply because a litigant claims that one exists or

21  promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d

22  15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007);

23  Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002).  Further, a

24  "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or

25  'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427

26  F.3d 1177, 1183 (9th Cir. 2006).  Additionally, the court has the discretion in appropriate

27  circumstances to consider materials that are not properly brought to its attention, but the court is

28  not required to examine the entire file for evidence establishing a genuine issue of material fact

1  where the evidence is not set forth in the opposing papers with adequate references.  See

2  Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San

3  Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001).  If the nonmoving party fails

4  to produce evidence sufficient to create a genuine issue of material fact, the moving party is

5  entitled to summary judgment.  See Nissan Fire & Marine, 210 F.3d at 1103.

6

7  **DEFENDANTS' MOTION**

8  *Defendants' Argument*

9  Defendants argue that Williams's complaint hinges on whether Barteau violated the

10  Fourth Amendment by entering the residence and arresting Williams.  However, Melissa gave

11  consent for Barteau to enter the residence in order to arrest Williams.  There is no dispute that

12  Melissa resided at 1360 W. Jean Ave.  Because Melissa gave consent to enter in order to arrest,

13  Barteau's entry was reasonable and the Fourth Amendment was not violated.[7]  Also, in reply,

14  Defendants argue that there is no dispute that Melissa gave consent to enter.  That Charles

15  resided in the garage, which was a contiguous part of the house, did not necessitate the need for

16  the officers to obtain a second consent in order to enter the garage.

17  *Plaintiff's Opposition*

18  Williams argues that he alone lived in the garage portion of the 1360 W. Jean Ave.

19  residence.  The garage was Williams's home.  The warrantless entry into the garage was

20  unreasonable under the Fourth Amendment.  There is a material dispute between the declarations

21  of Charles and Melissa.  Further, Melissa is bipolar and receives SSI checks due to mental

22  illness.  Melissa's credibility is at issue.

23  *Legal Standard*

24  "The Fourth Amendment generally prohibits the warrantless entry of a person's home,

25  whether to make an arrest or to search for specific objects."  Illinois v. Rodriguez, 497 U.S. 177,

26  181 (U.S. 1990).  In fact, "searches and seizures inside a home without a warrant are

27

28  [7]Defendants also argue that Barteau had probable cause to arrest Williams.  However, Williams does not dispute that probable cause existed to arrest him for burglary.

6

presumptively unreasonable." <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980).  "The

presumption of unconstitutionality that accompanies 'the [warrantless] entry into a home to

conduct a search or make an arrest' may be overcome only by showing 'consent or exigent

circumstances.'" <u>Lopez-Rodriguez v. Mukasey</u>, 536 F.3d 1012, 1016 (9th Cir. 2008) (quoting

<u>Steagald v. United States</u>, 451 U.S. 204, 211 (1981)); <u>see also</u> <u>Bashir v. Rockdale County</u>, 445

F.3d 1323, 1328 (11th Cir. 2006).  The "voluntary consent of a party who has authority over the

premises renders the warrantless entry of a person's home by law enforcement personnel

constitutionally valid." <u>Lopez-Rodriguez</u>, 536 F.3d at 1018; <u>see also</u> <u>Zimmerman v. Bishop

Estate</u>, 25 F.3d 784, 788 (9th Cir. 1994).  Voluntary consent may be obtained "either from the

individual whose property is searched . . . or from a third party who possesses common authority

over the premises." <u>Rodriguez</u>, 497 U.S. at 182.  Common authority "does not rest upon the law

of property, with its attendant historical and legal refinements . . . but rests rather on mutual use

of the property by persons generally having joint access or control for most purposes." <u>United

States v. Matlock</u>, 415 U.S. 164, 172 n. 7 (1974); <u>United States v. Murphy</u>, 516 F.3d 1117 (9th

Cir. Or. 2008).  A third party must have either actual authority or apparent authority in order to

give valid consent to enter and search.  <u>See</u> <u>Rodriguez</u>, 497 U.S. at 183-89; <u>United States v.

Davis</u>, 332 F.3d 1163, 1170 (9th Cir. 2003); <u>United States v. Enslin</u>, 327 F.3d 788, 793 (9th Cir.

2003).  "A third party has actual authority when he has mutual use of the property and also has

joint access or control for most purposes." <u>United States v. Dearing</u>, 9 F.3d 1428, 1429 (9t h Cir.

1993) (citing <u>Matlock</u>, 415 U.S. at 171 n.7).  "The apparent authority doctrine . . . is applicable

only if the facts believed by the officers would justify the search as a matter of law." <u>Davis</u>, 332

F.3d at 1170.  "The existence of apparent authority entails a three-part analysis.  First, did the

searching officer believe some untrue fact that was then used to assess the consent-giver's use of

and access to or control over the area searched?  Second, was it under the circumstances

objectively reasonable to believe that the fact was true?  Finally, assuming the truth of the

reasonably believed but untrue fact, would the consent-giver have had actual authority?" <u>United

States v. Fiorillo</u>, 186 F.3d 1136, 1144 (9th Cir. 1999); <u>see</u> <u>Enslin</u>, 327 F.3d at 793-94.  Apparent

authority is measured by an objective standard of reasonableness that examines the surrounding

circumstances.  See United States v. Ruiz, 428 F.3d 877, 881 (9th Cir. 2005).  "Even when the

invitation [to search] is accompanied by an explicit assertion that the person lives there, the

surrounding circumstances could conceivably be such that a reasonable person would doubt its

truth and not act upon it without further inquiry."  Rodriguez, 497 U.S. at 188; Dearing, 9 F.3d at

1430.

### Discussion

Williams's argument appears to be that, because he was residing in the garage of 1360 W.

Jean Ave., Melissa's consent to enter was defective.  The reason why consent is defective,

however, is never expressly explained by Williams.  Williams states that there is a conflict

between Melissa's declaration and Charles's declaration.  However, Williams does not explain

what conflict exists between these declarations or explain how the conflict may be material.

Charles's declaration contains no discussion about whether Melissa spoke to the officers,

whether Melissa actually gave consent to enter in order to arrest, whether the officers actually

asked for consent, or whether Melissa had joint access to the garage.  Charles's declaration

confirms that Williams was the only "occupant" of the garage, but it does not state that Melissa,

who is an adult family member and resident of 1360 W. Jean Ave., did not have mutual use and

joint access to the garage.

However, if Charles's declaration that Williams was the only "occupant" of the garage

creates a genuine issue as to Melissa's actual authority to consent to enter the garage, Melissa

nevertheless had apparent authority to consent.

The case of Enslin is highly analogous to the case at bar.  After noting that the law

enforcement officers knew that the Palacioses resided at the house in question, the Ninth Circuit

recited the following background:

> [The marshals] knocked and identified themselves to Larry Chance, Shannon
> Palacios' brother. When Shannon Palacios subsequently joined Chance at the
> door, they asked her if Bass was there and when she replied that he was not, they
> requested permission to search the house. Shannon Palacios gave them consent to
> search the house: she did not limit her consent to any part of the house or give any
> indication that she could not consent to their search of any part of the house,
> although the marshals admitted that she did not give them particularized consent
> to search the back bedroom where they subsequently found Enslin. The marshals
> also admitted that they did not tell her that she had a right not to consent or read

1   her the Miranda warnings.

2   The marshals entered the house and began searching for Bass. Two of them,
    Deputy Marshals Maddry and Kitts, went down the hallway and into the back
3   bedroom. Although the back bedroom door had a key lock, there is no indication
    in the record that the door was locked. When the marshals entered the room,
4   Enslin was in bed, apparently having just awakened from sleep. Enslin's hands
    were concealed underneath the covers.

5

6   Enslin, 327 F.3d at 791. Enslin filed a motion to suppress and argued that Shannon Palacios did

7   not have authority to consent to the search. Id. at 793. The Ninth Circuit assumed that Palacios

8   did not have actual authority to consent to the search, but nevertheless held that she had apparent

    authority. Id. at 793-94. The court explained:
9

10      Assuming Palacios did not have actual authority, the Government made the
        necessary showing to establish that she had apparent authority. The marshals
11      knew that John and Shannon Palacios were the residents of the house. The
        marshals did not know or have reason to believe that the Palacios rented the back
12      bedroom in the past or that Enslin was staying in the back bedroom. A person
        who identified herself as Shannon Palacios came to the door in response to their
13      arrival and gave them unlimited permission to search the house. Therefore, even
        assuming that Shannon Palacios did not have actual authority to consent, it was
14      objectively reasonable for the marshals to rely upon her consent to search the back
        bedroom.

15  Id. at 794. Additionally, Enslin had identified the presence of a key lock on the bedroom door as

16  evidence that should have undermined the marshals' belief in Shannon Palacios's apparent

17  authority. See id. The Ninth Circuit found that the presence of a key lock alone was insufficient

18  to dispel the apparent authority and cited United States v. Fiorillo, 186 F.3d 1136, 1144 (9th Cir.

19  1999). The Ninth Circuit parenthetically identified Fiorillo as "holding that consenting party had

20  apparent authority to allow a search of a locked back room when there was no indication prior to

21  the search that the room was leased, the consenting party gave a key to the officials, and there

22  was no sign or other indication on the door to the leased room." Enslin, 327 F.3d at 794.

23      Here, like Enslin, the evidence submitted indicates that Barteau knew that Melissa resided

24  at 1360 W. Jean Ave. Barteau had been told by Ortega that a "neighbor" had information and

25  that neighbor was Melissa. Melissa told Barteau that she had seen Ortega's stolen items in

26  Williams's possession and that Williams later left "the residence." At the residence, Barteau

27  spoke with Melissa and told her that he was there "to arrest her father." Further, Melissa,

28  Charles, and Williams himself all confirm that Melissa actually resided at 1360 W. Jean Ave.

1    Cf. Enlsin, 327 F.3d at 791.

2          Like *Enslin*, the consent to enter by Melissa was unqualified.[8]  Melissa knew that the

3    officers were at 1360 W. Jean Ave. to arrest Williams and she "did not limit her consent to any

4    part of the house or give any indication that she could not consent to their search of any part of

5    the house . . . ."  Cf. id.  That Melissa did not give particularized consent to enter the garage, just

6    as Shannon Palacios did not give particularized consent to search the back bedroom, does not

7    matter.  See id. at 791, 793-94.  The evidence indicates that the garage was attached to the house.

8    Charles declared that, after walking through the house with the officers, he arrived at the kitchen

9    and then knocked on the "kitchen/garage door."  Charles Williams, Sr. Dec. ¶ 5.  Melissa's

10   declaration also suggests that the garage is part of the residence/1360 W. Jean Ave. since she

11   declares that, after giving permission to the officers to "enter my home," the officers "came in

12   and arrested my father."  Melissa Williams Dec. ¶ 4.  Given the description of 1360 W. Jean

13   Ave., the Court sees no distinction between Enslin's back bedroom and Williams's attached

14   garage – both are part of the residence's structure.  Cf. Enslin, 327 F.3d at at 791, 793-94.

15         Finally, like *Enslin* and *Fiorillo*, Williams identifies no evidence that would cause

16   Barteau to reasonably question Melissa's apparent authority.  Cf. id.; Fiorillo, 186 F.3d at 1144.

17   Although Charles walked Barteau to the kitchen/garage door, knocked, asked to come in, and

18   told Williams that there were officers who wanted to talk to him, the Court does not see that the

19   conduct by Charles would sufficiently vitiate the apparent authority of Melissa.  There is no

20   indication that Charles told Barteau either that Charles was the primary renter of 1360 W. Jean

21   Ave., or that Melissa did not have authority to allow the officers into the garage, or that Williams

22   was the only occupant of the garage.

23         The evidence indicates that Melissa, at the least, had apparent authority to consent to

24   entry in order to effectuate an arrest.  See Enslin, 327 F.3d at 791, 793-94; Fiorillo, 186 F.3d at

---

26       [8]Charles's declaration reads that a Porterville police officer "came to my home and asked to speak with my
27   son [Williams].  I told the officer that I would get my son."  Charles Williams, Sr. Dec. ¶ 5.  It is not entirely clear
     whether the officer asked Charles if the officer could speak to Williams.  Nevertheless, Charles's declaration does
     not address whether Melissa was present, whether Melissa gave consent, or whether Barteau told Melissa that he was
28   there to arrest Williams.  Charles's declaration does not create a dispute about whether Melissa gave consent to enter
     in order to effectuate an arrest.

1144.  Since consent pursuant to apparent authority is a valid exception to the warrant

requirement to enter a residence, Barteau's conduct was reasonable and the Fourth Amendment

was not violated.  See Lopez-Rodriguez, 536 F.3d at 1018; Enslin, 327 F.3d at 791, 793-94;

Fiorillo, 186 F.3d at 1144; Zimmerman, 25 F.3d at 788.  Summary judgment in favor of

Defendants is appropriate.[9]


## CONCLUSION

The evidence is uncontradicted that Melissa, Williams's adult daughter, lived at 1360 W.

Jean Ave. and gave her express consent for Barteau to enter the residence and arrest Williams.

The evidence further shows that Melissa had at least apparent authority to consent to a search of

the entire residence, including the attached garage, and Williams has presented insufficient

evidence to show that her authority to consent did not at least appear to extend to the attached

garage.  Since Williams's claims are all predicated on Barteau's entry into the garage, and that

entry was reasonable due to Melissa's consent, summary judgment in favor Defendants is

appropriate on all claims.


Accordingly, IT IS HEREBY ORDERED that:

1.    Defendants' motion for summary judgment is GRANTED;

2.    Document No. 53 is STRICKEN; and

3.    The Clerk shall enter judgment in favor of Defendants and against Plaintiff and CLOSE

      this case.

IT IS SO ORDERED.

**Dated:    March 18, 2010**                             /s/ Anthony W. Ishii
                                              CHIEF UNITED STATES DISTRICT JUDGE

---

[9]The City of Porterville is named as a defendant.  However, the Complaint does not identify conduct by the City of Porterville.  Where there is no underlying constitutional violation, there can be no municipal liability under 42 U.S.C. § 1983 for that conduct.  See Los Angeles v. Heller, 475 U.S. 796 (1986); Long v. City & County of Honolulu, 511 F.3d 901, 907 (9th Cir. 2007); Jackson v. City of Bremerton, 268 F.3d 646, 653 (9th Cir. 2001). Additionally, a municipality "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory." Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978); see Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002).